CHAYA M. MANDELBAUM (SBN: 239084)
Email: cmm@rezlaw.com
ZOË DEGEER (SBN: 298698)
Email: zrd@rezlaw.com
RUDY, EXELROD, ZIEFF & LOWE, LLP
351 California Street, Suite 700
San Francisco, CA 94104
Telephone: (415) 434-9800
Facsimile: (415) 434-0513

Attorneys for Plaintiff
Robert Kaiden

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| ROBERT KAIDEN, | Case No. _____ |
| Plaintiff, | **COMPLAINT FOR SEVERANCE BENEFITS, EQUITABLE RELIEF, AND STATUTORY PENALTIES (ERISA)** |
| vs. | |
| ELON MUSK; X CORP., f/k/a TWITTER, INC.; TWITTER, INC. CHANGE OF CONTROL AND INVOLUNTARY TERMINATION PROTECTION POLICY; LINDSAY CHAPMAN; BRIAN BJELDE; and DHRUV BATURA, | |
| Defendants. | |
| _____/ | |

RUDY EXELROD ZIEFF & LOWE LLP
351 CALIFORNIA STREET, SUITE 700
SAN FRANCISCO, CALIFORNIA 94104
PH (415) 434-9800 | FX (415) 434-0513 | www.rezlaw.com

RUDY EXELROD ZIEFF & LOWE LLP
351 CALIFORNIA STREET, SUITE 700
SAN FRANCISCO, CALIFORNIA 94104
PH (415) 434-9800 | FX (415) 434-0513 | www.rezlaw.com

ROBERT KAIDEN, complains and alleges as follows:

## INTRODUCTION

1.      This case is yet another example of Elon Musk dodging his legal obligations and refusing to pay what he contractually owes.  Defendant Musk knew full well when he purchased Twitter, Inc. that certain key executives were entitled to industry-standard severance packages if they remained employed through the acquisition and then were fired without "Cause."  Relying on the promised severance benefits, Plaintiff Robert Kaiden, Twitter's Chief Accounting Officer ("CAO"), remained employed throughout the tumultuous acquisition period and carried out his responsibilities effectively, consistent with the directives of management and the Twitter Board of Directors, and in the best interests of the business.  After the deal closed however, Musk cheated Mr. Kaiden and other executives out of a combined $200,000,000 in severance benefits by falsely accusing them of misconduct and purporting to fire them for "Cause."

2.      Mr. Kaiden *never* engaged in *any* misconduct or did *anything* which could be considered "Cause" for termination.  Tellingly, Musk's termination letter did not include *any* facts demonstrating any misconduct or grounds for termination for "Cause."  With no factual basis, Musk simply accused Mr. Kaiden of misconduct as a ploy to evade paying him millions of dollars in severance benefits that Musk / Twitter owed to Mr. Kaiden.[1]

3.      Musk then appointed his agents (employees from his companies) to deny the severance claims filed by Mr. Kaiden as part of the severance benefit plan administration process. The entire termination and administrative claims process was a sham to deny in bad faith the claims of Mr. Kaiden and the other executives—who Musk terminated specifically to deny them the severance plan benefits.

4.      Mr. Kaiden brings this action for wrongful denial of severance benefits under Section 502(a)(1)(b) of the Employee Retirement Income Security Act of 1974, as amended ("ERISA").  Mr. Kaiden also brings a claim for refusal to provide materials required by ERISA, in violation of ERISA Section 502(c).

---

[1] Mr. Kaiden's severance benefits include twelve months of base salary and COBRA premiums, plus 50% of his unvested Restricted Stock Units.

**PARTIES**

5.      Plaintiff Robert Kaiden ("Plaintiff" or "Mr. Kaiden") was an employee of Twitter, Inc. (now Defendant X Corp., referred to collectively herein as "Twitter" or "the Company") from June 2015 until November 2022.  Throughout his tenure at the Company, Mr. Kaiden was Twitter's Chief Accounting Officer.  During his employment, Mr. Kaiden was a resident of Walnut Creek, California and worked in San Francisco, California.  Mr. Kaiden continues to reside in Walnut Creek, California.  Mr. Kaiden is a participant, as defined by ERISA § 3(7), 29 U.S.C. § 1002(7), in the Twitter, Inc. Change of Control and Involuntary Termination Protection Policy, as amended and restated effective August 8, 2014 (the "Plan").[2]

6.      Defendant Elon Musk is the Chairman, Sole Director, Chief Technology Officer, and controlling shareholder of Defendant X Corp., the entity into which he merged Twitter, Inc. as a result of the acquisition.  At all times relevant to the Complaint, Musk was the CEO of X Corp.  Defendant Musk was and is the de facto Administrator of the Plan.

7.      Defendant X Corp. is a Nevada corporation with its headquarters in San Francisco, California and successor in interest to Twitter, Inc., a Delaware corporation headquartered in San Francisco, California. X Corp. succeeded to all of Twitter's obligations upon the October 27, 2022, closing of the merger transaction, including Twitter's obligations under the Plan.  X Corp. is the Plan Sponsor, de facto Administrator, and funding source of the Plan.

8.      Upon Musk's acquisition of Twitter, there was and continues to be such unity of interest and ownership between Twitter and Musk that there is no longer a separate corporate status among Musk, Twitter, and Twitter's successor X Corp.  Musk controls Twitter's decision making and operations and disregards corporate formalities in conducting Twitter's operations based on his personal whims and/or polls conducted from his personal Twitter account.

9.      Musk often employs and relies on Excession, LLC ("Excession"), his personal family office, and Excession employees to conduct X Corp. business.  Musk also relies on personal friends, family members, and longtime business associates and investors to provide

---

[2] A copy of the Plan is attached hereto as Exhibit A.

RUDY EXELROD ZIEFF & LOWE LLP
351 CALIFORNIA STREET, SUITE 700
SAN FRANCISCO, CALIFORNIA 94104
PH (415) 434-9800 | FX (415) 434-0513 | www.rezlaw.com

RUDY EXELROD ZIEFF & LOWE LLP
351 CALIFORNIA STREET, SUITE 700
SAN FRANCISCO, CALIFORNIA 94104
PH (415) 434-9800 | FX (415) 434-0513 | www.rezlaw.com

services to Twitter.  On information and belief, Musk brought in family members to work at Twitter.

10.     Musk has commingled assets of his other companies with Twitter.  On information and belief, Musk has allowed Twitter's assets to be used by his other companies, including Tesla and xAI.  Additionally, Musk regularly uses employes of his other companies to conduct Twitter business and has granted them access to Twitter's systems and records.  For instance, as the Delaware Court of Chancery found, Musk enlisted approximately fifty Tesla engineers to provide services to Twitter following the acquisition, none of whom were hired, retained, or paid by Twitter for services they provided to Twitter.  xAI employees also reportedly have been working out of Twitter's headquarters.

11.     It would be inequitable and unjust to prevent Plaintiff Kaiden from recovering benefits and other remedies from Defendant Musk, who is personally responsible for and will individually benefit from the acts of Twitter.

12.     Defendant Plan is a welfare benefit plan as defined by ERISA § 3(1), 29 U.S.C. § 1002(1), because it is a plan or program that was established or maintained by Twitter for the purpose of providing its participants with severance benefits.  The Plan is sponsored by Twitter.

13.     Defendant Lindsay Chapman identified herself in a July 7, 2023, letter denying Mr. Kaiden's claim for benefits as the Administrator of the Plan.  Defendant Chapman, whose LinkedIn profile identifies her as a Senior Director of Human Resources at one of Musk's other companies (SpaceX) also purports to be a member of the Twitter Severance Administration Committee ("Committee"), which assertedly decided the administrative appeal that Plaintiff Kaiden submitted.  Defendant Brian Bjelde also purports to be a member of the Committee and is Vice President of Human Resources at SpaceX:  ostensibly Defendant Chapman's boss.  Defendant Dhruv Batura also purports to be a member of the Committee.  On information and belief Defendant Batura is or was at relevant times a Senior Director of Finance at X Corp., having previously worked for Musk for ten years at Tesla, Inc. (yet another Musk company).

///

///

RUDY EXELROD ZIEFF & LOWE LLP
351 CALIFORNIA STREET, SUITE 700
SAN FRANCISCO, CALIFORNIA 94104
PH (415) 434-9800 | FX (415) 434-0513 | www.rezlaw.com

**JURISDICTION, VENUE, AND DIVISIONAL ASSIGNMENT**

14.     This Court has subject matter jurisdiction over Plaintiff's claims pursuant to ERISA §§ 502(e) and (f), 29 U.S.C. §§ 1332(e) and (f), and 28 U.S.C. § 1331.  Additionally, this Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332(a) because the parties are citizens of different states.  The amount in controversy exceeds $75,000 exclusive of interest and costs.

15.     Venue lies in the Northern District of California pursuant to ERISA § 502(e)(2), 29 U.S.C. § 1132(e)(2), because the Twitter Change of Control and Involuntary Termination Protection Policy is administered in part in this District, and because Defendant can be found in this District.  Venue is also proper pursuant to 28 U.S.C. § 1391(b), because a substantial part of the events or omissions giving rise to Plaintiff's claims occurred within this District.

16.     Plaintiff was employed in, and significant events material to this case occurred within, the County of San Francisco.  The obligations and liability complained of herein arose in the County of San Francisco, and Plaintiff suffered injury in the County of San Francisco.  This action is subject to assignment to the San Francisco division.

**FACTUAL BACKGROUND**

**A.      Mr. Kaiden's Successful Performance at Twitter.**

17.     Mr. Kaiden served as the CAO of Twitter from June 2015 until November 2022.  He had several key responsibilities and duties in the position, including overseeing global accounting, technical revenue accounting, billing and receivables, accounts payable, and finance operations.

18.     During the entirety of his tenure as Twitter's CAO, Mr. Kaiden successfully met and frequently exceeded the performance expectations set for him.  In his 2021 performance evaluation, the last one he received while working for Twitter, he received a Consistently Met and Sometimes Exceeded Expectations rating.

19.     From August 2017 through the October 2022 acquisition, Mr. Kaiden's supervisor was Ned Segal, Twitter's Chief Financial Officer ("CFO").  Mr. Segal worked with Mr. Kaiden on a daily basis during this period and determined that Mr. Kaiden successfully met and

1   frequently exceeded the performance expectations set for him.  Mr. Segal is not aware of

2   anything Mr. Kaiden did, or failed to do, that amounted to gross negligence or willful

3   misconduct, or that otherwise amounts to Cause.

4       20.     Until the day he was notified he was being terminated, Mr. Kaiden also did not

5   receive any feedback from any other executive or from the Board indicating that he had engaged

6   any conduct that amounted to Cause.

7       **B.     Elon Musk Created Massive Uncertainty During his Chaotic Takeover of**

8       **Twitter.**

9       21.     Starting in January 2022, Defendant Musk began accumulating significant

10  amounts of Twitter, Inc. common stock.  By April, he had over a nine percent ownership stake.

11      22.     After initially accepting and then backing out of Twitter's offer to join Twitter's

12  Board of Directors, on April 13, 2022, Musk made an unsolicited offer to purchase the company

13  at a price of $54.20 per share, which was a substantial premium over where the stock was then

14  trading.  After reviewing the offer and considering alternatives, Twitter's Board ultimately

15  accepted Musk's offer to purchase the company, and the Merger Agreement was signed on

16  April 25, 2022.

17      23.     Musk then attempted to back out of the deal.  By May 13, 2022, Musk had

18  tweeted that the deal was "temporarily on hold."  Musk continued to maintain that he was not

19  bound to go through with the acquisition, culminating in his delivery to Twitter of a July 8, 2022,

20  notice purporting to terminate the Merger Agreement.

21      24.     Twitter sued Musk to enforce the Merger Agreement.  After intense litigation and

22  on the eve of trial (and Musk's deposition), Musk caved and agreed to complete the acquisition.

23  On October 27, 2022, the acquisition closed.  However, between mid-May and late October,

24  there was enormous uncertainty as to whether the deal would close, as reflected in Twitter's

25  volatile stock price during those months.  Many employees left the company during this

26  tumultuous period.  Mr. Kaiden and other executives worked diligently to retain key employees

27  and to operate the business responsibly and consistent with the Merger Agreement and their

28  obligations to the Twitter, Inc. Board and shareholders.

RUDY EXELROD ZIEFF & LOWE LLP
351 CALIFORNIA STREET, SUITE 700
SAN FRANCISCO, CALIFORNIA 94104
PH (415) 434-9800 | FX (415) 434-0513 | www.rezlaw.com

RUDY EXELROD ZIEFF & LOWE LLP
351 CALIFORNIA STREET, SUITE 700
SAN FRANCISCO, CALIFORNIA 94104
PH (415) 434-9800 | FX (415) 434-0513 | www.rezlaw.com

25.     As has been publicly reported, Musk then rushed the closing of the deal and immediately fired multiple top executives, including former CEO Parag Agrawal, in a misguided and legally improper ambush to interfere with their right to severance benefits under the Plan.  As he took over the day-to-day operations, Musk issued various draconian ultimatums to employees including that they should resign unless they were willing to "work[] long hours at high intensity" and "be extremely hardcore."  He tweeted that employees who were working remotely would be required to return to in person work.  Hundreds more employees resigned, further threatening the stability of the company.

### C.     Musk Terminated Mr. Kaiden And Claimed It Was For Cause.

26.     On November 2, 2022, the Company sent a letter to Mr. Kaiden, signed by Mr. Musk, notifying Mr. Kaiden that he was being terminated "effective immediately."  The Company's termination letter claimed that Mr. Kaiden was being terminated for cause under subsection (e) "gross negligence or willful misconduct in the performance of [his] duties."  Musk did not state or otherwise identify or refer to any facts, events, or circumstances to support these assertions.

27.     Underscoring the malicious intent, the Company didn't even pay Mr. Kaiden the salary he had indisputably earned during his final pay period before he was terminated.  It has still not done so.

### D.     Musk's Employees Denied Mr. Kaiden's Claim for Benefits and Appeal.

#### 1.     Musk Employee Lindsay Chapman Denied Mr. Kaiden's Claim for Benefits.

28.     On January 5, 2023, Mr. Kaiden made a claim for benefits under the Plan. Because Musk's termination letter had stated no facts on which he based his conclusory allegations of gross negligence or willful misconduct, there were no facts for Mr. Kaiden to rebut. However, Mr. Kaiden's claim articulated the grounds for his entitlement to benefits under the Plan.

///

///

COMPLAINT

CASE NO. _____

29.    On July 7, 2023, Ms. Chapman sent Mr. Kaiden a letter denying his claim for benefits, purportedly in her role as appointed Plan Administrator.  In the denial letter, Ms. Chapman stated that she denied Mr. Kaiden's claim because Mr. Kaiden was terminated for Cause based on his gross negligence or willful misconduct in the performance of his duties.

30.    Ms. Chapman's conclusion that Mr. Kaiden had engaged in gross negligence or willful misconduct was purportedly supported by her conclusions that: 1) Mr. Kaiden failed to prevent the payment of transaction related legal expenses on the expedited basis approved by Twitter's Board of Directors ("Board"); 2) he failed to prevent the payment of retention bonuses that Twitter now maintains were outside the ordinary course of business; and 3) he failed to prevent the aggressive growth oriented operating plan other high level executives and the Board designed and approved.

31.    The denial was devoid of any evidence that Mr. Kaiden failed to perform his actual CAO function with diligence and care.  To the contrary, such evidence would have been impossible as Mr. Kaiden was undisputedly deemed to have successfully performed his role in the eyes of his supervisor and the Board at the time of his employment; and in the fashion they expected of him.  To reach the desired conclusion that Mr. Kaiden engaged in "gross negligence or willful misconduct in the performance of his duties", Twitter invented a new role, where the CAO was expected to second-guess or veto decisions outside of his purview that were made by higher level executives and approved by the Board.  Such conduct, in reality, would have amounted to insubordination and a failure on Mr. Kaiden's part to fulfil his job duties and fiduciary obligations – conduct that would have given rise to his termination under an explicit separate portion of the Cause definition.

**2.    Mr. Kaiden Timely Appealed the Improper Denial of His Claim.**

32.    On October 4, 2023, Mr. Kaiden submitted a request for review of the denial to Twitter's Severance Administration Committee.  Mr. Kaiden's appeal was supported by declarations and documentary evidence.  His appeal included a sworn declaration from his supervisor at Twitter, CFO Ned Segal.  In his declaration, Mr. Segal testified that Mr. Kaiden successfully met and frequently exceeded performance expectations.  Mr. Segal stated that he

RUDY EXELROD ZIEFF & LOWE LLP
351 CALIFORNIA STREET, SUITE 700
SAN FRANCISCO, CALIFORNIA 94104
PH (415) 434-9800 | FX (415) 434-0513 | www.rezlaw.com

was not aware of anything Mr. Kaiden did, or failed to do, that amounted to gross negligence or willful misconduct and debunked the specific factual basis Twitter relied on to support their denial of Mr. Kaiden's claim.

33.     The appeal also included Mr. Kaiden's last performance review while an employee at Twitter which reflected a high-performance rating of "Consistently Met and Sometimes Exceeded Expectations" and was devoid of any negative feedback that could conceivably be construed as gross negligence or willful misconduct.

34.     With respect to the specific reasons cited by Twitter in its denial letter, Mr. Kaiden's appeal established: 1) that he played no role in law firm compensation decisions and handled the technical aspects of payment processing of transaction expenses prudently; 2) Mr. Kaiden did not award or approve any 2022 retention bonuses to his team and had no authority to reject retention bonuses determined by other teams; and 3) Mr. Kaiden was not involved in the development of Twitter's three-year growth operating plan that Twitter was (retroactively) second-guessing.

### 3.     Musk's Employees Purporting to Act as the Severance Administration Committee Denied Mr. Kaiden's Appeal.

35.     On February 1, 2024, Twitter's Severance Administration Committee (the "Committee") denied Mr. Kaiden's request for review.  On information and belief, the Committee is made up of Ms. Chapman and other employees from Musk's companies (such as Mr. Bjelde and Mr. Batura) acting on behalf of, and in the interests of Musk, and not in the interests of the Plan or its participants.

36.     The denial essentially concedes that Mr. Kaiden did not directly engage in any of the conduct Twitter used to deny his claim, but nevertheless fault him for allegedly failing to avail himself of the material information relevant to the transaction payments to law firms, payments of retention bonuses, and the Company's wasteful spending and his further alleged failure to communicate any red flags to his superior officer.

37.     The denial is devoid of any evidence or even specific factual allegation that Mr. Kaiden had not sufficiently reviewed the merger agreement or otherwise failed to educate

RUDY EXELROD ZIEFF & LOWE LLP
351 CALIFORNIA STREET, SUITE 700
SAN FRANCISCO, CALIFORNIA 94104
PH (415) 434-9800| FX (415) 434-0513 | www.rezlaw.com

RUDY EXELROD ZIEFF & LOWE LLP
351 CALIFORNIA STREET, SUITE 700
SAN FRANCISCO, CALIFORNIA 94104
PH (415) 434-9800 | FX (415) 434-0513 | www.rezlaw.com

himself regarding material information.  It is similarly devoid of any evidence or specific factual allegation that Mr. Kaiden had failed to communicate any material information or "red flags" that Mr. Segal was not aware of.  Perhaps most notably, the denial seemingly ignores the fact that Mr. Segal submitted a sworn declaration testifying that he was aware of no basis to conclude the Mr. Kaiden had engaged in gross negligence or willful misconduct.  Mr. Segal's declaration was executed in September 2023, when all relevant events and transaction related disputes had already occurred.  Mr. Segal was in the best position to verify whether Mr. Kaiden failed to educate him regarding any material information or failed to escalate any red flags and his declaration is devoid of any such concerns.

## **LEGAL CLAIMS**

## **FIRST CAUSE OF ACTION**

### **(ERISA § 502(a)(1)(B), 29 U.S.C. § 1132(a)(1)(B))**

### **(Claim for Benefits)**

### **(Against All Defendants)**

38.    Plaintiff re-alleges and incorporates each and every paragraph above as though fully set forth herein.

39.    ERISA § 502(a)(1)(B), 29 U.S.C. § 1132(a)(1)(B), permits a plan participant to bring a civil action to recover benefits due to him under the terms of a plan, to enforce his rights under the terms of a plan, and/or to clarify his right to future benefits under the terms of a plan.

40.    Plaintiff is entitled to benefits under the Defendant Plan.

41.    Defendants, and each of them, have violated, and continue to violate, the terms of the Plan and Plaintiff's rights thereunder.  Defendants, and each of them, have failed to pay Plaintiff benefits to which he is entitled under the terms of the Plan.

42.    Plaintiff is entitled to severance benefits under the terms of the Plan in the amount of approximately $3.75 million dollars, plus interest, with the precise amount to be proven at trial.

///

///

**SECOND CAUSE OF ACTION**

**(ERISA § 502(c), 29 U.S.C. § 1132(c))**

**(Failure to Provide Required Materials)**

**(Against All Defendants)**

43.    Plaintiff re-alleges and incorporates by reference each and every paragraph above as though fully set forth herein.

44.    On several occasions—including on January 5, 2023, July 13, 2023, and February 7, 2024—Mr. Kaiden requested documents relevant to his claim for benefits from the Plan Administrator, pursuant to Section 104(b)(4) of ERISA, 29 U.S.C. § 1024(b)(4).

45.    ERISA Section 502(c), 29 U.S.C. § 1132 (c), requires a Plan Administrator within 30 days of a request to provide all documents required to be maintained and provided to participants.  Defendants did not timely comply, and have still not complied, by producing all of the documents and information required to be provided.

46.    Moreover, Defendants also failed to timely provide Plaintiff the documents required to be produced pursuant to 29 C.F.R. § 2560.503-1(m)(8).

47.    Because Defendants violated ERISA Section 502(c), 29 U.S.C. § 1132 (c), Plaintiff is entitled to a penalty of $110 per day, running from the 30th day following his January 5, 2023, written request, until the complete materials are provided.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff Robert Kaiden prays for judgment and the following specific relief against Defendants as follows:

1.    Declare that Defendants have violated the terms of the Plan by failing to pay Plaintiff benefits in accordance with the term of the Plan;

2.    Order Defendants, and each of them, to pay benefits to Plaintiff under the terms of the Plan;

3.    For statutory attorneys' fees and costs, pursuant to ERISA Section 502(g), 29 U.S.C. § 1132(g);

///

RUDY EXELROD ZIEFF & LOWE LLP
351 CALIFORNIA STREET, SUITE 700
SAN FRANCISCO, CALIFORNIA 94104
PH (415) 434-9800 | FX (415) 434-0513 | www.rezlaw.com

4.    For statutory penalties of $110 per day from February 4, 2023, to the date that Defendants provide Plaintiff with all documents and information required under ERISA Sections 104(b) and 502(c)(1), 29 U.S.C. §§ 1024(b), 1132(c)(1), and 29 C.F.R. § 2560.503-1(m)(8);

5.    For prejudgment interest and post-judgment interest as allowed by law; and

6.    For an award of such other and further relief as the Court deems just and proper.

DATED:  June 9, 2024

Respectfully submitted,

RUDY, EXELROD, ZIEFF & LOWE, LLP

By: _____

CHAYA M. MANDELBAUM
ZOË DEGEER
*Attorneys for Plaintiff Robert Kaiden*

RUDY EXELROD ZIEFF & LOWE LLP
351 CALIFORNIA STREET, SUITE 700
SAN FRANCISCO, CALIFORNIA 94104
PH (415) 434-9800 | FX (415) 434-0513 | www.rezlaw.com

# EXHIBIT A

Twitter, Inc.

**Change of Control and Involuntary Termination Protection Policy**

**(as amended and restated effective August 8, 2014)**

This Change of Control and Involuntary Termination Protection Policy (the "**Policy**") is designed to provide certain protections to a select group of key Twitter, Inc. ("**Twitter**" or the "**Company**") employees if their employment is negatively affected by a change on control of Twitter. The Policy is designed to be an "employee welfare benefit plan," as defined in Section 3(1) of the Employee Retirement Income Security Act of 1974, as amended ("**ERISA**") and this document is both the formal plan document and the required summary plan description for the Policy.

**Eligible Employee**: You are only eligible for Change of Control Severance Benefits and non-Change of Control Severance Benefits under the policy if you are an eligible employee under this Policy (an "**Eligible Employee**") and comply with its terms. To be an Eligible Employee, you (1) must have been designated as eligible by the Compensation Committee of the Board (the "**Compensation Committee**") and (2) must have executed a Participation Agreement (as defined below).

**Severance Benefits**: As an Eligible Employee for Change of Control Severance Benefits, you will be eligible for severance benefits under this Policy if: (1) during the Change of Control Period (as defined below) and (2) your employment with Twitter or any of its subsidiaries terminates as a result of an Involuntary Termination (a "**COC Qualified Termination**"). If your employment with Twitter or any of its subsidiaries terminates as a result of a COC Qualified Termination, you will be eligible to receive the applicable Equity Vesting, Cash Severance and COBRA Benefit described herein and specified on your Participation Agreement. As an Eligible Employee for non-Change of Control Severance Benefits, you will be eligible for severance benefits under this Policy if: (1) other than during a Change of Control Period and (2) your employment with Twitter or any of its subsidiaries is terminated by the Company other than for Cause, death or Disability (a "**Non-COC Qualified Termination**"). If your employment with Twitter or any of its subsidiaries terminates as a result of a Non-COC Qualified Termination, you will be eligible to receive the applicable Equity Vesting, Cash Severance and COBRA Benefit described herein and specified on your Participation Agreement.  All benefits under this Policy shall be subject to your compliance with the Release Requirement and timing modifications required to avoid adverse taxation under Section 409A.  A "Qualified Termination" is either a COC Qualified Termination or a Non-COC Qualified Termination, depending on whether it occurs within or outside of the Change of Control Period.

**Equity Vesting**: Upon a Qualified Termination, a percentage set forth on your Participation Agreement of the then-unvested shares subject to each of your then-outstanding equity awards shall immediately vest and, in the case of options and stock appreciation rights, shall become exercisable (for avoidance of doubt, no more than 100% of the shares subject to the outstanding portion of an equity award may vest and, with respect to an option or stock appreciation right, become exercisable pursuant to this provision). In the case of equity awards with performance-based vesting, all performance goals or other vesting criteria will be deemed achieved at target levels as to the percentage set forth on your Participation Agreement. Subject to any payment delay necessary to comply with Section 409A (as defined below), any restricted stock units, performance shares, performance units, and/or similar full value awards that vest under this paragraph will be settled on the 61st day following your Qualified Termination.

**Cash Severance**: Upon a Qualified Termination, you will be eligible to receive a lump-sum severance payment equal to a percentage set forth on your Participation Agreement of your Base Salary. Your severance payment will be paid in cash and in full on the 61st day following your Qualified Termination. If you die before all amounts have been paid, such unpaid amounts will be paid to your designated beneficiary, if living, or otherwise to your

personal representative in a lump-sum payment (less any withholding taxes) as soon as possible following your death.

**COBRA Benefit**: Upon a Qualified Termination, if you make a valid election under COBRA to continue your health coverage, the Company will (for a limited time set forth on your Participation Agreement) pay the cost of such continuation coverage for you and any eligible dependents that were covered under the Company's health care plans immediately prior to the date of your eligible termination ("**COBRA Benefit**"). Notwithstanding the preceding, if the Company determines in its sole discretion that it cannot provide the COBRA Benefit without potentially violating applicable law (including, without limitation, Section 2716 of the Public Health Service Act), the Company will instead provide you a taxable lump-sum payment in an amount equal to the applicable number of months of the COBRA Benefit *multiplied by* the monthly COBRA premium that you would be required to pay to continue your group health coverage in effect on the date of termination of employment (which amount will be based on the premium for the first month of COBRA coverage). If the Company provides for a taxable cash payment in lieu of the COBRA Benefit, then such cash payment will be made regardless of whether you elect COBRA continuation coverage and such payment will be made in full on the 61st day following your termination of employment.

**Release**: Notwithstanding any other term of this Policy, the receipt of any severance payments or benefits pursuant to this Policy is subject to your signing and not revoking the Company's then-standard separation agreement and release of claims (the "**Release**" and such requirement, the "**Release Requirement**"), which must become effective and irrevocable no later than the sixtieth (60th) day following your Qualified Termination (the "**Release Deadline**"). If the Release does not become effective and irrevocable by the Release Deadline, you will forfeit any right to severance payments or benefits under this Policy. In no event will severance payments or benefits be paid or provided until the Policy until the Release actually becomes effective and irrevocable.

For purposes of this Policy, the following terms shall have the following meanings:

"**Base Salary**" means your annual base salary as in effect immediately prior to your Qualified Termination date or, if greater, at the level in effect immediately prior to the Change of Control in the case of a COC Qualified Termination.

"**Board**" means the Board of Directors of the Company.

"**Cause**" means (a) your unauthorized use or disclosure of the Company's confidential information or trade secrets, which use or disclosure causes material harm to the Company; (b) your breach of any agreement between you and the Company; (c) your failure to comply with the Company's written policies or rules, including its code of conduct; (d) your conviction of, or plea of "guilty" or "no contest" to, a felony under the laws of the United States or any state thereof; (e) your gross negligence or willful misconduct in the performance of your duties; (f) your continuing failure to perform assigned duties after receiving written notification of the failure from the Board (or for Eligible Employees other than the Chief Executive Officer, from the Chief Executive Officer); or (g) your failure to cooperate in good faith with a governmental or internal investigation of the Company or its directors, officers or employees, if the Company has requested your cooperation; provided, however, that "Cause" will not be deemed to exist in the event of subsections (b), (c) or (f) above unless you have been provided with (i) 30 days' written notice by the Board or the act or omission constituting "Cause" and (ii) 30 days' opportunity to cure such act or omission, if capable of cure.

"**Change of Control**" means the occurrence of any of the following events:

    A. Change in Ownership of the Company. A change in the ownership of the Company which occurs on the date that any one person, or more than one person acting as a group ("**Person**"), acquires ownership of the stock of the Company that, together with the stock held by such Person, constitutes more than fifty percent (50%) of the total voting power of the stock of the Company; provided, however, that the

acquisition of additional stock by any one Person who is considered to own more than fifty percent (50%) of the total voting power of the stock of the Company will not be considered a Change of Control; or

B.   Change in Effective Control of the Company. If the Company has a class of securities registered pursuant to Section 12 of the Exchange Act, a change in the effective control of the Company which occurs on the date that a majority of members of the Board is replaced during any 12 month period by directors whose appointment or election is not endorsed by a majority of the members of the Board prior to the date of the appointment or election. For purposes of this clause (B), if any Person is considered to be in effective control of the Company, the acquisition of additional control of the Company by the same Person will not be considered a Change of Control; or

C.   Change in Ownership of a Substantial Portion of the Company's Assets. A change in the ownership of a substantial portion of the Company's assets which occurs on the date that any Person acquires (or has acquired during the 12 month period ending on the date of the most recent acquisition by such person or persons) assets from the Company that have a total gross fair market value equal to or more than 50% of the total gross fair market value of all of the assets of the Company immediately prior to such acquisition or acquisitions; provided, however, that for purposes of this subsection, the following will not constitute a change in the ownership of a substantial portion of the Company's assets: (i) a transfer to an entity that is controlled by the Company's stockholders immediately after the transfer, or (ii) a transfer of assets by the Company to: (a) a stockholder of the Company (immediately before the asset transfer) in exchange for or with respect to the Company's stock, (b) an entity, fifty percent (50%) or more of the total value or voting power of which is owned, directly or indirectly, by the Company, (c) a Person, that owns, directly or indirectly, fifty percent (50%) or more of the total value or voting power of all the outstanding stock of the Company, or (d) an entity, at least fifty percent (50%) of the total value or voting power of which is owned, directly or indirectly, by a Person.

Notwithstanding the foregoing, a transaction will not be deemed a Change of Control unless the transaction qualifies as a change in control event within the meaning of Section 409A (as defined below).

"**Change of Control Period**" means the period on, and twelve (12) months following, a Change of Control.

"**COBRA**" means the Consolidated Omnibus Budget Reconciliation Act of 1985, as amended.

"**Disability**" means the total and permanent disability as defined in Section 22(e)(3) of the Code unless the Company maintains a long-term disability plan at the time of the Eligible Employee's termination, in which case, the determination of disability under such plan also will be considered "Disability" for purposes of this Policy.

"**Exchange Act**" means the Securities and Exchange Act of 1934, as amended.

"**Good Reason**" means your termination of employment following, without your written consent, either (a) a reduction in your base salary of over 20% other than in connection with a Company-wide reduction in salary, (b) relocation of you by the Company to a facility or location more than 50 miles from your principal office location immediately prior to such relocation or (c) during the Change of Control Period only, your title is demoted or otherwise changed to one that ranks below the level of Vice President; provided, however, that a termination for Good Reason shall not have occurred unless (i) you deliver to the Company a written notice explaining the circumstances constituting Good Reason within 30 days after the first occurrence of the circumstances constituting Good Reason, (ii) the Company has failed within 30 days following receipt of such notice to cure the circumstances constituting Good Reason, and (iii) your employment terminates no later than 30 days following the expiration of such cure period.

"**Involuntary Termination**" means a termination of employment by the Company other than for Cause, death or Disability or a termination of employment by you for Good Reason.

"**Participation Agreement**" means an agreement in the form attached hereto as Exhibit A.

**Section 409A**: The Company intends that all payments and benefits provided under this Policy or otherwise are exempt from, or comply with, the requirements of Section 409A of the Internal Revenue Code of 1986, as amended, and any guidance promulgated thereunder ("**Section 409A**") so that none of the payments or benefits will be subject to the additional tax imposed under Section 409A, and any ambiguities herein will be interpreted to so comply. No payment or benefits to be paid to you, if any, pursuant to this Policy or otherwise, when considered together with any other severance payments or separation benefits that are considered deferred compensation under Section 409A (together, the "**Deferred Payments**") will be paid or otherwise provided until you have a "separation from service" within the meaning of Section 409A. If, at the time of your termination of employment, you are a "specified employee" within the meaning of Section 409A and the payment of the Deferred Payments will be delayed to the extent necessary to avoid the imposition of the additional tax imposed under Section 409A, which generally means that you will receive payment on the first payroll date that occurs on or after the date that is 6 months and 1 day following your termination of employment. The Company reserves the right to amend the Policy as it deems necessary or advisable, in its sole discretion and without the consent of any Eligible Employee or any other individual, to comply with Section 409A the Code or to otherwise avoid income recognition under Section 409A prior to the actual payment of any benefits or imposition of any additional tax. Each payment, installment and benefit payable under this Policy is intended to constitute a separate payment for purposes of U.S. Treasury Regulation Section 1.409A-2(b)(2).

In no event will the Company reimburse you for any taxes that may be imposed on you as a result of Section 409A. Each payment and benefit payable hereunder is intended to constitute a separate payment for purposes of Section 1.409A-2(b)(2) of the Treasury Regulations.

**Parachute Payments**:

**Reduction of Severance Benefits.** Notwithstanding anything set forth herein to the contrary, if any payment or benefit that an Eligible Employee would receive from the Company or any other party whether in connection with the provisions herein or otherwise (the "**Payment**") would (i) constitute a "parachute payment" within the meaning of Section 280G of the Internal Revenue Code of 1986, as amended (the "**Code**"), and (ii) but for this sentence, be subject to the excise tax imposed by Section 4999 of the Code (the "**Excise Tax**"), then such Payment shall be equal to the Best Results Amount. The "**Best Results Amount**" shall be either (x) the full amount of such Payment or (y) such lesser amount as would result in no portion of the Payment being subject to the Excise Tax, whichever of the foregoing amounts, taking into account the applicable federal, state and local employment taxes, income taxes and the Excise Tax, results in the Eligible Employee's receipt, on an after-tax basis, of the greater amount notwithstanding that all or some portion of the Payment may be subject to the Excise Tax. If a reduction in payments or benefits constituting "parachute payments" is necessary so that the Payment equals the Best Results Amount, reduction shall occur in the following order: reduction of cash payments; cancellation of accelerated vesting of stock awards; reduction of employee benefits. In the event that acceleration of vesting of stock award compensation is to be reduced, such acceleration of vesting shall be cancelled in the reverse order of the date of grant of the Eligible Employee's stock awards unless the Eligible Employee elects in writing a different order for cancellation. The Eligible Employee shall be solely responsible for the payment of all personal tax liability that is incurred as a result of the payments and benefits received under this Policy, and the Eligible Employee will not be reimbursed by the Company for any such payments.

**Determination of Excise Tax Liability.** The Company shall select a professional services firm to make all of the determinations required to be made under these paragraphs relating to "Parachute Payments." The Company shall request that firm provide detailed supporting calculations both to the Company and the Eligible Employee prior to the date on which the event that triggers the Payment occurs if

administratively feasible, or subsequent to such date if events occur that result in parachute payments to the Eligible Employee at that time. For purposes of making the calculations required under these paragraphs relating to "Parachute Payments," the firm may make reasonable assumptions and approximations concerning applicable taxes and may rely on reasonable, good faith determinations concerning the application of the Code. The Company and the Eligible Employee shall furnish to the firm such information and documents as the firm may reasonably request in order to make a determination under these paragraphs relating to "Parachute Payments." The Company shall bear all costs the firm may reasonably incur in connection with any calculations contemplated by these paragraphs relating to "Parachute Payments." Any such determination by the firm shall be binding upon the Company and the Eligible Employee, and the Company shall have no liability to the Eligible Employee for the determinations of the firm.

**Administration**: The Policy will be administered by the Compensation Committee or its delegate (in each case, an "**Administrator**"). The Administrator will have full discretion to administer and interpret the Policy. Any decision made or other action taken by the Administrator with respect to the Policy, and any interpretation by the Administrator of any term or condition of the Policy, or any related document, will be conclusive and binding on all persons and be given the maximum possible deference allowed by law. The Administrator is the "named fiduciary" of the Policy for purposes of ERISA and will be subject to the fiduciary standards of ERISA when acting in such capacity.

**Attorneys Fees**: The Company and each Eligible Employee bear their own attorneys' fees incurred in connection with any disputes between them.

**Exclusive Benefits**: Except as may be set forth in your Participation Agreement, this Policy is intended to be the only agreement between you and the Company regarding any severance payments or benefits to be paid to you on account of a termination of employment whether unrelated to, concurrent with, or following, a Change of Control. Accordingly, by executing your Participation Agreement, you hereby forfeit and waive any rights to any severance or change of control benefits set forth in any employment agreement, offer letter and/or equity award agreement, except as set forth in this Policy and/or in your Participation Agreement.

**Withholding**: The Company is authorized to withhold from any payments or benefits all federal, state, local and/or foreign taxes required to be withheld therefrom and any other required payroll deductions.

**Amendment or Termination**: The Company reserves the right to amend or terminate the Policy at any time, without advance notice to any Eligible Employee or other individual and without regard to the effect of the amendment or termination on any Eligible Employee or on any other individual.  Notwithstanding the preceding, (a) any amendment to the Policy that causes an individual or group of individuals to cease to be an Eligible Employee will not be effective with respect to Qualified Terminations unless it is both approved by the Administrator and communicated to the affected individual(s) in writing at least 6 months prior to the effective date of the amendment or termination, and (b) no amendment or termination of the Policy shall be made within 12 months following a Change of Control to the extent that such amendment or reduction would reduce the benefits provided hereunder or impair an Eligible Employee's eligibility under the Policy (unless the affected Eligible Employee consents to such amendment or termination).  Any amendment or termination of the Policy will be in writing.  Any action of the Company in amending or terminating the Policy will be taken in a non-fiduciary capacity.

**Claims Procedure**: Any Eligible Employee who believes he or she is entitled to any payment under the Policy may submit a claim in writing to the Administrator. If the claim is denied (in full or in part), the claimant will be provided a written notice explaining the specific reasons for the denial and referring to the provisions of the Policy on which the denial is based. The notice will also describe any additional information needed to support the claim and the Policy's procedures for appealing the denial. The denial notice will be provided within 90 days after the claim is received. If special circumstances require an extension of time (up to 90 days), written notice of

the extension will be given within the initial 90-day period. This notice of extension will indicate the special circumstances requiring the extension of time and the date by which the Administrator expects to render its decision on the claim.

**Appeal Procedure**: If the claimant's claim is denied, the claimant (or his or her authorized representative) may apply in writing to the Administrator for a review of the decision denying the claim. Review must be requested within 60 days following the date the claimant received the written notice of their claim denial or else the claimant loses the right to review. The claimant (or representative) then has the right to review and obtain copies of all documents and other information relevant to the claim, upon request and at no charge, and to submit issues and comments in writing. The Administrator will provide written notice of the decision on review within 60 days after it receives a review request. If additional time (up to 60 days) is needed to review the request, the claimant (or representative) will be given written notice of the reason for the delay. This notice of extension will indicate the special circumstances requiring the extension of time and the date by which the Administrator expects to render its decision. If the claim is denied (in full or in part), the claimant will be provided a written notice explaining the specific reasons for the denial and referring to the provisions of the Policy on which the denial is based. The notice shall also include a statement that the claimant will be provided, upon request and free of charge, reasonable access to, and copies of, all documents and other information relevant to the claim and a statement regarding the claimant's right to bring an action under Section 502(a) of ERISA.

**Successors**: Any successor to the Company of all or substantially all of the Company's business and/or assets (whether direct or indirect and whether by purchase, merger, consolidation, liquidation or other transaction) will assume the obligations under the Policy and agree expressly to perform the obligations under the Policy the same manner and to the same extent as the Company would be required to perform such obligations in the absence of a succession. For all purposes under the Policy, the term "Company" will include any successor to the Company's business and/or assets which become bound by the terms of the Policy by operation of law, or otherwise.

**Applicable Law**: The provisions of the Policy will be construed, administered and enforced in accordance with ERISA and, to the extent applicable, the internal substantive laws of the state of California (but not its conflict of laws provisions).

**Additional Information.**

| | |
|---|---|
| **Plan Name:** | Twitter, Inc. Change of Control Severance and Involuntary Termination Protection Policy |
| **Plan Sponsor:** | Twitter, Inc.<br>1355 Market St, Suite 900<br>San Francisco, CA 94103 |
| **Identification Numbers:** | |
| **Plan Year:** | Company's Fiscal Year |
| **Plan Administrator:** | Twitter, Inc.<br>*Attention:* Administrator of the Twitter, Inc. Change of Control Severance and Involuntary Termination Protection<br>1355 Market St, Suite 900<br>San Francisco, CA 94103 |
| **Agent for Service of** | |

| | |
|---|---|
| **Legal Process:** | Twitter, Inc. |
| | *Attention:* General Counsel |
| | 1355 Market St, Suite 900 |
| | San Francisco, CA 94103 |
| | |
| | Service of process may also be made upon the Plan Administrator. |
| **Type of Plan** | Severance Plan/Employee Welfare Benefit Plan |
| **Plan Costs** | The cost of the Policy is paid by the Company. |

**Statement of ERISA Rights.**

Policy Eligible Employees have certain rights and protections under ERISA:

They may examine (without charge) all Policy documents, including any amendments and copies of all documents filed with the U.S. Department of Labor, such as the Policy's annual report (Internal Revenue Service Form 5500). These documents are available for review in the Company's Human Resources Department.

They may obtain copies of all Policy documents and other Policy information upon written request to the Plan Administrator. A reasonable charge may be made for such copies.

In addition to creating rights for Eligible Employees, ERISA imposes duties upon the people who are responsible for the operation of the Policy. The people who operate the Policy (called "fiduciaries") have a duty to do so prudently and in the interests of Eligible Employees. No one, including the Company or any other person, may fire or otherwise discriminate against an Eligible Employee in any way to prevent them from obtaining a benefit under the Policy or exercising rights under ERISA. If an Eligible Employee's claim for a severance benefit is denied, in whole or in part, they must receive a written explanation of the reason for the denial. An Eligible Employee has the right to have the denial of their claim reviewed. (The claim review procedure is explained above.)

Under ERISA, there are steps Eligible Employees can take to enforce the above rights. For instance, if an Eligible Employee requests materials and does not receive them within 30 days, they may file suit in a federal court. In such a case, the court may require the Administrator to provide the materials and to pay the Eligible Employee up to $110 a day until they receive the materials, unless the materials were not sent because of reasons beyond the control of the Plan Administrator. If an Eligible Employee has a claim which is denied or ignored, in whole or in part, he or she may file suit in a state or federal court. If it should happen that an Eligible Employee is discriminated against for asserting their rights, he or she may seek assistance from the U.S. Department of Labor, or may file suit in a federal court.

In any case, the court will decide who will pay court costs and legal fees. If the Eligible Employee is successful, the court may order the person sued to pay these costs and fees. If the Eligible Employee loses, the court may order the Eligible Employee to pay these costs and fees, for example, if it finds that the claim is frivolous.

If an Eligible Employee has any questions regarding the Policy, please contact the Plan Administrator. If an Eligible Employee has any questions about this statement or about their rights under ERISA, they

may contact the nearest area office of the Employee Benefits Security Administration (formerly the Pension and Welfare Benefits Administration), U.S. Department of Labor, listed in the telephone directory, or the Division of Technical Assistance and Inquiries, Employee Benefits Security Administration, U.S. Department of Labor, 200 Constitution Avenue, N.W. Washington, D.C. 20210. An Eligible Employee may also obtain certain publications about their rights and responsibilities under ERISA by calling the publications hotline of the Employee Benefits Security Administration.

<u>EXHIBIT A</u>

**Change of Control Severance and Involuntary Termination Protection Policy**
**Participation Agreement**

This Participation Agreement ("**Agreement**") is made and entered into by and between Robert Kaiden on the one hand, and Twitter, Inc. (the "**Company**") on the other.

<u>RECITALS</u>

The Company adopted a Change of Control Severance Policy (the "**Policy**") to assure that the Company will have the continued dedication and objectivity of the participants in the Policy.

The Company has designated you as eligible for protection under the Policy and this Agreement, subject to your qualifying as an Eligible Employee.

Unless otherwise defined herein, the terms defined in the Policy, which is hereby incorporated by reference, shall have the same defined meanings in this Agreement.

<u>AGREEMENT</u>

**NOW, THEREFORE**, in consideration of the mutual covenants contained herein, the parties hereto agree as follows:

The terms and conditions of your participation in the Policy are as set forth in the Policy.

**COC Qualified Termination.**

You have been designated as an Eligible Employee for COC Qualified Terminations in the Policy, a copy of which is attached hereto, subject to your satisfying the criteria of being an Eligible Employee on the date of a COC Qualified Termination. In the event of a COC Qualified Termination, you will be entitled to the following benefits, subject to your compliance with the Policy:

| | |
|---|---|
| Your equity vesting benefit shall be | 50% |
| Your percentage of Base Salary shall be | 100% |
| Your COBRA benefit shall be | 12 months |

**Non-COC Qualified Termination.**

You have been designated as an Eligible Employee for Non-COC Qualified Terminations in the Policy, a copy of which is attached hereto, subject to your satisfying the criteria of being an Eligible Employee on the date of the Non-COC Qualified Termination. In the event of a Non-COC Qualified Termination, you will be entitled to the following benefits, subject to your compliance with the Policy:

| | |
|---|---|
| Your equity vesting benefit shall be | 6.25% |
| Your percentage of Base Salary shall be | 50% |

Your COBRA benefit shall be                                        6 months


**Other Provisions.**

You agree that the Policy constitutes the entire agreement of the parties hereto and supersedes in their entirety all prior representations, understandings, undertakings or agreements (whether oral or written and whether expressed or implied) of the parties, and shall specifically supersede any severance and/or change of control provisions of any offer letter, employment agreement, or equity award agreement entered into between the you and Company.

This Agreement may be executed in counterparts, each of which will be deemed an original, but all of which together will constitute one and the same instrument.

        IN WITNESS WHEREOF, each of the parties has executed this Agreement, in the case of the Company by its duly authorized officer, as of the day and year set forth below.

TWITTER, INC.                                    ELIGIBLE EMPLOYEE

                                                 *Robert Kaiden*

By:_____          Signature:__Robert Kaiden (May 18, 2022 19:50 PDT)__

Date:___May 18, 2022_____          Date:__May 18, 2022_____


*[Signature Page of the Participation Agreement]*