CHAYA M. MANDELBAUM (SBN 239084)
Email: cmm@rezlaw.com
ZOË R. DeGEER (SBN 298698)
Email: zrd@rezlaw.com
RUDY, EXELROD, ZIEFF & LOWE, LLP
351 California Street, Suite 700
San Francisco, CA 94104
Telephone: (415) 434-9800
Facsimile: (415) 434-0513

Attorneys for Plaintiff
Robert Kaiden

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| ROBERT KAIDEN, <br><br> Plaintiff, <br><br> vs. <br><br> ELON MUSK; X CORP., f/k/a TWITTER, INC.; TWITTER, INC. CHANGE OF CONTROL AND INVOLUNTARY TERMINATION PROTECTION POLICY; LINDSAY CHAPMAN; BRIAN BJELDE; and DHRUV BATURA, <br><br> Defendant. | Case No. 24-cv-03554-MMC <br><br> **JOINT CASE MANAGEMENT CONFERENCE STATEMENT** <br><br> Date: October 18, 2024 <br> Time: 10:30 a.m. <br> Place: Courtroom 7 <br> Judge: Hon. Maxine M. Chesney <br><br> Complaint Filed: June 12, 2024 <br> Trial Date: None Set |

Pursuant to the Court's August 9, 2024, Case Management Conference Order, the Parties hereby submit this Joint Case Management Conference Statement.

### 1. Jurisdiction and service

Plaintiff's claims arise under the Employee Retirement Income Security Act of 1974, 29 U.S.C. Sections 1001-1461 ("ERISA"). This Court has subject matter jurisdiction over the claims pursuant to 29 U.S.C. Section 1132(e)(1) and 28 U.S.C. Section 1331. All Defendants have been served (or waived service) and have appeared in the action.

### 2. Facts

#### a. Plaintiff's Brief Chronology of Facts

This case is about Defendant Elon Musk's abuse of the ERISA process to deprive Plaintiff Kaiden of $3.75 million dollars in severance benefits.

Mr. Kaiden served as the Chief Accounting Officer ("CAO") of Twitter from June 2015 until November 2022. He had several key responsibilities and duties in the position, including overseeing global accounting, technical revenue accounting, billing and receivables, accounts payable, and finance operations.

During the entirety of his tenure as Twitter's CAO, Mr. Kaiden successfully met and frequently exceeded the performance expectations set for him. In his 2021 performance evaluation, the last one he received while working for Twitter, he received a Consistently Met and Sometimes Exceeded Expectations rating.

From August 2017 through the October 2022 acquisition, Mr. Kaiden's supervisor was Ned Segal, Twitter's Chief Financial Officer ("CFO"). Mr. Segal worked with Mr. Kaiden on a daily basis during this period and determined that Mr. Kaiden successfully met and frequently exceeded the performance expectations set for him. Mr. Segal is not aware of anything Mr. Kaiden did, or failed to do, that amounted to gross negligence or willful misconduct, or that otherwise amounts to Cause.

Until the day he was notified he was being terminated, Mr. Kaiden also did not receive any feedback from any other executive or from the Board indicating that he had engaged any conduct that amounted to Cause.

On November 2, 2022, less than a week after Defendant Musk acquired Twitter, the Company sent a letter to Mr. Kaiden, signed by Mr. Musk, notifying Mr. Kaiden that he was being terminated "effective immediately." The Company's termination letter claimed that Mr. Kaiden was being terminated for cause under subsection € "gross negligence or willful misconduct in the performance of [his] duties." Musk did not state or otherwise identify or refer to any facts, events, or circumstances to support these assertions.

Knowing that there was no "Cause" for his termination, Kaiden filed an ERISA claim for benefits. Musk, or those acting on his behalf, appointed one of his agents as Plan Administrator to deny Caldwell's claim. The Plan Administrator, Lindsay Chapman, identified herself in correspondence regarding Kaiden's claim as a part of Twitter, as indicated on her Twitter email address and Twitter letterhead. Defendant Chapman's LinkedIn profile also identifies her as a Senior Director of Human Resources at one of Musk's other companies (SpaceX). In other words, the Plan Administrator consistently identifies herself as Musk's employee.

On July 7, 2023, Ms. Chapman sent Mr. Kaiden a letter denying his claim for benefits, purportedly in her role as appointed Plan Administrator. In the denial letter, Ms. Chapman stated that she denied Mr. Kaiden's claim because Mr. Kaiden was terminated for Cause based on his gross negligence or willful misconduct in the performance of his duties.

Ms. Chapman's conclusion that Mr. Kaiden had engaged in gross negligence or willful misconduct was purportedly supported by her conclusions that: 1) Mr. Kaiden failed to prevent the payment of transaction related legal expenses on the expedited basis approved by Twitter's Board of Directors ("Board"); 2) he failed to prevent the payment of retention bonuses that Twitter now maintains were outside the ordinary course of business; and 3) he failed to prevent the aggressive growth oriented operating plan other high-level executives and the Board designed and approved.

The denial was devoid of any evidence that Mr. Kaiden failed to perform his actual CAO function with diligence and care. To the contrary, such evidence would have been impossible as Mr. Kaiden was undisputedly deemed to have successfully performed his role in the eyes of his supervisor and the Board at the time of his employment; and in the fashion they expected of him.

To reach the desired conclusion that Mr. Kaiden engaged in "gross negligence or willful misconduct in the performance of his duties", Twitter invented a new role, where the CAO was expected to second-guess or veto decisions outside of his purview that were made by higher level executives and approved by the Board.  Such conduct, in reality, would have amounted to insubordination and a failure on Mr. Kaiden's part to fulfil his job duties and fiduciary obligations – conduct that would have given rise to his termination under an explicit separate portion of the Cause definition.

Because the Plan Administrator's denial was so clearly erroneous, Mr. Kaiden promptly appealed, providing facts and evidence to dispute the Plan Administrator's conclusions.  The request for review was supported by documents and declarations, including a declaration from Mr. Kaiden's immediate supervisor, CFO Ned Segal.

Further cementing the conflict of interest and ensuring that the outcome would be favorable to Musk, Musk (or those acting on his behalf) appointed to the review committee Chapman herself, as well as her apparent boss, and a third Musk employee.  In other words, the committee reviewing the correctness of the Plan Administrator's decision included the Plan Administrator who made the decision, the Musk employee who supervises her, and a third long-time Musk employee.  There was not an iota of independence at any step of the process.

Not surprisingly, on February 1, 2024, Twitter's Severance Administration Committee (the "Committee") denied Mr. Kaiden's request for review.  The denial essentially concedes that Mr. Kaiden did not directly engage in any of the conduct Twitter used to deny his claim, but nevertheless faults him for allegedly failing to avail himself of the material information relevant to the transaction payments to law firms, payments of retention bonuses, and the Company's wasteful spending and his further alleged failure to communicate any red flags to his superior officer.

The denial is devoid of any evidence or even specific factual allegation that Mr. Kaiden had not sufficiently reviewed the merger agreement or otherwise failed to educate himself regarding material information.  It is similarly devoid of any evidence or specific factual allegation that Mr. Kaiden had failed to communicate any material information or "red flags" that

Mr. Segal was not aware of.  Perhaps most notably, the denial seemingly ignores the fact that Mr. Segal submitted a sworn declaration testifying that he was aware of no basis to conclude the Mr. Kaiden had engaged in gross negligence or willful misconduct.  Mr. Segal's declaration was executed in September 2023, when all relevant events and transaction related disputes had already occurred.  Mr. Segal was in the best position to verify whether Mr. Kaiden failed to educate him regarding any material information or failed to escalate any red flags and his declaration is devoid of any such concerns.

### b. Defendants' Brief Chronology of the Facts.

On November 2, 2022, Twitter, Inc. (now X Corp.) terminated Plaintiff, Twitter's former Chief Accounting Officer ("CAO"), for cause.  Plaintiff exhibited critical disregard for his job duties, which included oversight of Twitter's accounts payable and finance operations, and engaged in "gross negligence" or "willful misconduct" within the meaning of the Plan by, among other things:

- Disregarding the company's interest in ensuring that it paid only amounts it was obligated to pay for legal services under relevant agreements and facilitating the payment of more than $100 million in law firm fees just prior to the closing of the merger, despite the buyer's objection to any such payments.

- Failing to gather material information and raise red flags regarding the payment of retention bonuses outside the ordinary course of business, in contravention to the buyer's stated objection to any expansion of the retention bonus program.

- Fostering a culture of excessive and wasteful spending and failing to reduce expenses in the face of growing operating losses and missed growth targets.

After his termination for cause, Plaintiff submitted a claim for benefits under the Plan, which he alleges amounts to $3.75 million.  However, severance benefits are not owed to former executives who have been terminated for cause under the Plan's express terms.  Availing himself of the Plan's procedures for making claims under the Plan, Plaintiff submitted his original claim for benefits with the help of experienced legal counsel.

///

His claim was decided by a neutral and unconflicted Plan Administrator.[1] The Plan Administrator has broad discretionary authority to interpret the Plan and decide claims for benefits under the Plan. Compl., Ex. A at ECF page 18 of 23 ("The Administrator will have full discretion to administer and interpret the [Plan]. Any decision made or action taken by the Administrator with respect to the [Plan], and any interpretation by the Administrator of any term or condition of the [Plan], or any related document, will be conclusive and binding on all persons and be given the maximum possible deference allowed by the law.").

The Plan Administrator carefully considered Plaintiff's claim before issuing a decision thoroughly explaining the reasons for denying the claim. The Plan administrator concluded that Plaintiff engaged in gross negligence and willful misconduct by (i) accelerating the payment of more than $100 million in expenses, including law firm fees, in the days immediately before closing, which led to the company paying millions of dollars more in legal fees than it was contractually obligated to pay, including excessive and gratuitous success fees and project fees; (ii) allowing for the payment of excessive compensation and retention and spot bonuses in violation of the merger agreement; and (iii) contributing to corporate waste and failing to prevent unreasonable company expenses resulting from unnecessary headcount growth, unreasonably expensive real estate and perks for employees, lavish parties and events, the purchase of excessive and unnecessary infrastructure, among other things.

Plaintiff requested and received relevant documents and subsequently submitted an appeal—again, through counsel—attaching various evidence. The appeal was considered and denied by a duly-appointed Committee that reviewed and considered Plaintiff's appeal, and the arguments and evidence offered in support. In the end, the Committee agreed with the Plan Administrator that Plaintiff was terminated for Cause. The Committee found that Plaintiff engaged in gross negligence and willful misconduct by: (1) failing to take any steps to gather material information and raise red flags regarding the payment of more than $100 million in law firm payments just prior to the closing of the merger, in contravention of his job responsibilities;

---

[1] Despite Plaintiff's assertion, it is unremarkable that the Plan Administrator used Twitter letterhead to correspond with a former Twitter employee soon after Twitter merged with brand new Musk-related entities.

(2) failing to take any steps to gather material information and raise red flags regarding the payment of retention bonuses outside the ordinary course of business, in contravention of his job responsibilities; and (3) fostering a culture of excessive and wasteful spending and failing to reduce expenses in the face of growing operating losses and missed growth targets.  Although Plaintiff contends that he was not required to "second-guess" decisions he claims were approved by superiors, Plaintiff was an officer of the company and had fiduciary obligations to the company which he violated by failing to avail himself of material information, identify red flags, and report upward or address those issues falling within his area of responsibility as CAO.

Although Plaintiff disagrees with the Plan Administrator's and Committee's conclusions, he cannot dispute that the Plan expressly conferred discretionary authority on the Plan Administrator and Committee to interpret the Plan and decide claims for benefits under the Plan. As a result, the determinations can be overturned only for an abuse of discretion.  *See Abatie v. Alta Health & Life Ins. Co.*, 458 F.3d 955 (9th Cir. 2006).  Plaintiff cannot establish any abuse of discretion by the Plan Administrator or Committee.  Accordingly, Plaintiff's ERISA § 502(a)(1)(B) claim fails because Plaintiff was terminated for cause and was ultimately determined to be ineligible for severance benefits based upon an independent assessment by the Plan Administrator and Committee.

Plaintiff also seeks to recover a $110 per day statutory penalty for an alleged delay in producing unspecified, ERISA-required documents.  Such statutory penalties are only available when certain governing plan documents are not timely produced to a plan participant.  29 U.S.C. §§ 1024(b), 1132(c)(1). Plaintiff received those documents long before he filed this action, and he is not entitled to any statutory penalties for any alleged delay in producing them.  To the extent Plaintiff seeks penalties for documents he claims were not produced in violation of regulations concerning the claims and appeals process, those documents are not subject to § 1024(b) or § 1132(c)(1), as a matter of law, so penalties are unavailable.  *See, e.g., Lee v. ING Groep, N.V.*, 829 F.3d 1158, 1162 (9th Cir. 2016).

///

///

### 3. Legal Issues

The Parties dispute the following main legal issues: (1) the appropriate standard of review the Court should apply in resolving Plaintiff's claim for benefits; (2) the scope of the administrative record and materials the Court should consider in resolving the benefits claim; (3) whether Plaintiff is entitled to benefits under ERISA Section 502(a)(1)(B): and (4) whether Defendants Chapman and Musk are liable for failing to timely provide Plaintiffs with required materials under ERISA Section 502(c).

### 4. Motions

The Parties anticipate filing cross Rule 52 motions for judgment. Discovery motions are also possible. Should the Parties disagree regarding the propriety or scope of discovery, counsel will meet and confer in good faith. If counsel are unable to reach agreement, a discovery motion will be necessary.

### 5. Amendment of Pleadings

The Parties do not currently anticipate amending the pleadings but reserve their respective rights to do so and believe they will be better positioned to evaluate this after initial discovery. Plaintiff requests February 5, 2025, as a deadline to amend the complaint.

### 6. Evidence Preservation

The Parties have reviewed the Guidelines Relating to the Discovery of Electronically Stored Evidence and will continue to meet and confer regarding the reasonable and proportionate steps to preserve evidence relevant to this action. Defendants have been notified and will instruct their agents to preserve documents relevant to Plaintiff's claims. Defendants have been notified to preserve potentially relevant documents and relevant third parties have been notified of the litigation. Plaintiff has also been notified to preserve documents relevant to the claims and defenses.

### 7. Disclosures

The Parties have agreed to exchange initial disclosures under Federal Rule of Civil Procedure 26(a)(1) on or before October 11, 2024.

///

### 8. Discovery

Plaintiff's position is that fact discovery should proceed regarding the standard of review; relating to the alleged conflict of interest and bias permeating the ERISA claims process; regarding the additional documents requested, but not produced, relating to the denial of Kaiden's claim for benefits; and regarding the completeness of the administrative record.

Defendants' position is that discovery should be limited to: (1) the administrative record; and (2) discovery relating to the Plan Administrator's and Committee's alleged conflict of interest in adjudicating Plaintiff's claim for benefits.

### 9. Class Actions

Not applicable.

### 10. Related Cases

*Nicholas Caldwell v. Musk, et al.*, 24-CV-02022-MMC, is a "related" case within the meaning of Civil Local Rule 3-12(a); *see also* Dkt. 32 (related case order).

In addition, *Agrawal, et al. v. Musk, et al.*, 3:24-cv-01304-MMC and *Personette, et al. v. Musk, et al.*, 3:24-cv-06266, are cases pending in this Court involving separate claims relating to the same severance plan.

### 11. Relief

Plaintiff seeks severance benefits under the terms of the Plan in the amount of approximately $3.75 million dollars, plus interest, with the precise amount to be proven at trial. Plaintiff also alleges that, because Defendants violated ERISA Section 502(c), 29 U.S.C. § 1132(c), Plaintiff is entitled to a penalty of $110 per day, running from the 30th day following his January 5, 2023, written request, until the complete materials are provided. Plaintiff also seeks attorneys' fees and costs and pre- and post-judgment interest which will continue to accrue until the case is resolved and any judgment is paid.

Defendants reserve their right to recover attorneys' fees and costs in the event they prevail on Plaintiff's claims in this action, and further reserve their rights to seek relief with respect to any claims or counter-claims they may later assert in this action.

///

### 12. Settlement and ADR

On September 18, 2024, counsel for the Parties met and conferred about ADR. Plaintiff is amenable to a private mediation or a settlement conference before a magistrate judge or other judicial officer pursuant to ADR Local Rule 7. Defendants are amenable to engaging in private mediation or a settlement conference before a magistrate judge or other judicial officer at the appropriate time.

### 13. Other References

The Parties do not believe that the case is suitable for reference to binding arbitration, a special master, or the Judicial Panel on Multidistrict Litigation.

### 14. Narrowing of Issues

The Parties have not identified any stipulations or other means to narrow the issues before the Court. As the case progresses, counsel will continue to meet and confer regarding ways to streamline the case.

### 15. Expedited Trial Procedures.

The Parties do not believe that this case is appropriate for the Expedited Trial Procedures of General Order 65 Attachment A.

### 16. Scheduling

The Parties jointly propose the following schedule:

- Fact discovery cut-off: June 27, 2025
- Expert designations (if any) – July 25, 2025
- Expert discovery cutoff (if any) – October 3, 2025
- Briefing Relating to Rule 52 Motion for Judgment
    - Plaintiff's Motion due February 16, 2026
    - Defendants' Opposition/Cross-Motion for Judgment due March 20, 2026
    - Plaintiff's Reply/Opposition due April 24, 2026
    - Defendants' Reply due May 29, 2026
    - Hearing: June 26, 2026

///

### 17. **Trial**

Plaintiff believes that any claims asserted in the Complaint that proceed to trial will be tried to the Court. Plaintiff estimates that the trial would be approximately five court days.

Defendants believe that most if not all of this case should be adjudicated through Rule 52 motions and that a separate bench trial will be unnecessary. If the case does proceed to trial in any respect, Defendants estimate the trial would take up to five court days.

### 18. **Disclosure of Non-Party Interested Entities or Persons**

Plaintiff filed his Certification of Conflicts and Interested Entities or Persons on July 18, 2024, stating that there is no conflict or interest (other than the named parties) to report.

Defendants filed their Rule 7.1 Corporate Disclosure Statement and Civil L.R. 3-15 Certification of Conflicts and Interested Entities or Persons on July 17, 2024, stating that Defendant X Corp. is wholly owned by X Holdings Corp. and that there is no conflict or interest (other than the named parties) to report.

### 19. **Professional Conduct**

All attorneys of record for the Parties have reviewed the Guidelines for Professional Conduct for the Northern District of California.

DATED: October 2, 2024            Respectfully submitted,

RUDY, EXELROD, ZIEFF & LOWE, LLP

By:   */s/ Chaya M. Mandelbaum*
CHAYA M. MANDELBAUM
ZOË R. DeGEER
*Attorneys for Plaintiff Robert Kaiden*

DATED: October 2, 2024            MORGAN, LEWIS & BOCKIUS LLP

By:   */s/ Abbey M. Glenn*
ABBEY M. GLENN
CHRISTOPHER BORAN
*Attorneys for Defendants Elon Musk; X Corp.; Twitter, Inc. Change of Control and Involuntary Termination protection Policy; Lindsay Chapman; Brian Bjelde; Dhruv Batura*

**ATTESTATION**

Pursuant to Local Rule 5-1(i)(3), I attest that each of the other signatories to this document has concurred in the filing of the document.

DATED:  October 2, 2024

*/s/ Chaya M. Mandelbaum*
CHAYA M. MANDELBAUM